Filed 10/16/13  In re Alissa M. CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ALISSA M. et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>KIMBERLY N.,<br><br>        Defendant and Appellant. | F066545<br><br>(Super. Ct. Nos. JJV065446A-D)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Hugo Loza, Commissioner.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum, Chief Deputy County Counsel, and Carol E. Helding, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Wiseman, Acting P.J., Levy, J., and Kane, J.

Kimberly N. (mother) appeals from an order terminating parental rights (Welf. & Inst. Code, § 366.26) to her four children.[1]  Mother contends the juvenile court erred when it determined that the beneficial-relationship exception did not apply in this case.

We disagree and affirm the court's order.

## *FACTUAL AND PROCEDURAL HISTORIES*

Mother has four children, Alissa M., Mario N., Jacob N., and Katelyn N.  Her husband is the father of Mario, Jacob, and Katelyn.[2]  In May 2011, the family came to the attention of the Tulare County Health and Human Services Agency (Agency) when it was reported that the youngest child, 11-month-old Katelyn, had a spiral fracture of her left arm and a bruise on her face.  Her hair was filthy and nits could be seen throughout her hair.  She had been to the hospital on two previous occasions—once for a bump on the head and another time for a burn on her face that was allegedly caused by a Hot Pocket falling on her face.

The family's house was found to be in deplorable condition.  Mother admitted to using methamphetamine, and father admitted to using marijuana.  Mother and father both admitted they could not handle the children and needed parenting and marriage counseling because they were financially strained.  Mother said she did not know what happened to Katelyn because her glasses were broken.  Father said he did not know what happened to Katelyn because he was not home.  Alissa, who was eight years old at the time, told a social worker that Mario sat on Katelyn's arm and her arm turned purple.  Alissa reported that she told mother what happened but mother was sleeping.  Alissa also reported that she usually cleaned the house two or three times a day and she took care of the babies; mother and father did not help.  Alissa said she fed Katelyn and changed Katelyn and Jacob's diapers.

[1]Subsequent statutory references are to the Welfare and Institutions Code.

[2]We refer to mother's husband as "father," although he is not Alissa's biological father, and we refer to mother and father collectively as "parents."

2.

The children were taken into protective custody on May 15, 2011.

The Agency filed a juvenile dependency petition on behalf of all four children on May 17, 2011. It was alleged, among other things, that the negligence of mother and father and their failure to protect Katelyn from injury had caused her to suffer serious harm. Mother's conduct placed Alissa, Mario, and Jacob at substantial risk of serious physical harm or illness, and father's conduct placed Mario and Jacob at substantial risk of harm. It was further alleged that mother and father's substance abuse rendered them unable to provide for their children. (§ 300, subd. (b).) As to Alissa only, it was alleged that her father, Alvin M., had left her without provision for support and his whereabouts were unknown. (§ 300, subd. (g).) In addition, it was alleged that, in 2003, the Monterey County juvenile court had found that mother had failed to protect Alissa from Alvin's physical abuse. There was substantial risk that Alissa's half-siblings would similarly be abused or neglected because mother failed to address the issues underlying the dependency case involving Alissa. (§ 300, subd. (j).) The juvenile court ordered the children detained.

On July 26, 2011, the juvenile court found amended allegations of neglect true and adjudged the children dependents of the court. The children were ordered removed from the custody of mother and father, and family reunification services were ordered for parents.

In a status review report filed on December 20, 2011, the Agency reported that mother and father had made substantial progress in their case plans. Parents had completed the initial phase of an outpatient drug treatment program and participated in four to six NA/AA meetings each week. They also participated in their church's recovery program. Mother was subject to random drug testing and her results were all negative, except for a few "no shows." Father had found a job, and mother continued her employment with Walmart. They had completed an 18-week parenting class and had

begun an in-home parenting class. They said they would continue to work on their case plan "as they need their children to be returned to their care as soon as possible."

The children were placed with their maternal grandmother, who stated that it was a pleasure to have her grandchildren in her care. The children slept well and did not have "out of control behavioral issues." Mario appeared to be the most affected by the removal from home and would say he missed his mommy and ask for her every night. The Agency reported, "Despite what has all occurred the children are doing great overall and talk about their mother and father all the time in regards to when they get to go home." Parents had unsupervised visitation and overnight visits, and the children appeared to benefit significantly from the visits.

Finding that mother and father had demonstrated they were capable of meeting the children's basic needs, the Agency recommended that the children be returned home to their custody with family maintenance services. In an addendum report filed on December 30, 2011, however, the Agency reported that parents had disclosed that they had received an eviction notice. They intended to dispute the eviction, but if they were evicted, they would have to relocate. For this reason, the Agency changed its recommendation and instead recommended that the children remain dependents of the juvenile court and the social worker be granted discretion to place them in parental care with family maintenance services when deemed appropriate.

Mother and father agreed with the Agency's new recommendation. On January 4, 2012, the juvenile court adopted the Agency's recommendation and granted the social worker discretion to place the children with parents. Reunification services and visitation were to continue for mother and father.

On February 6, 2012, the children were returned to parents' care with family maintenance services. A social worker, Dianna Murray, visited the home the same day and spoke with the two older children, Alissa, who was then nine years old, and Mario, who was four. (The younger children, ages one and two, were primarily nonverbal.)

4.

Alissa said she was so happy to be home and she did not miss her grandma yet. Murray asked Mario if he was happy to be home with his mother and father, and he smiled and shouted, "Yeah."

Murray visited the home on March 16, 2012. Mother and father had finished in-home parenting class. They took turns attending their church recovery program, with the other parent staying home with the children. Parents reported that it had been a challenge keeping the children on a routine and they had their good and bad days.

Subsequently, Murray was unable to reach the parents by telephone and made an unannounced visit on April 5, 2012. Parents reported that they lost their only cell phone and they did not yet have a landline. Mother and father had also missed a random drug test in March. On April 13, 2012, the social worker learned that mother and father had been dismissed from the Child Abuse Intervention Program because of absences. Parents continued to be unavailable by telephone. On May 17, 2012, Murray made an unannounced visit to the home and was greeted by the paternal grandmother. She told Murray that parents had gone grocery shopping. On May 24, 2012, Murray made another unannounced home visit. The house was messy with dirty clothes on the floor in the bedrooms and toys and trash on the floor in the children's bedroom. Mother said it had been a hectic and overwhelming week. Murray requested paperwork, including work and school schedules, documentation of Jacob's recent visit to an eye clinic, and a letter showing compliance with the aftercare recovery program. On May 29, 2012, Murray told mother she needed the requested paperwork that day. Mother said she would drop the paperwork off within an hour, but she did not show up as agreed.

In a status review report filed on May 29, 2012, the Agency advised that it would be premature to close the case and recommended continuing in-home services for parents. "[S]ince the children have come home, completing all court ordered services, maintaining part-time employment and attending school full-time has been more of a challenge than the parents had ever expected." Although parents were noncompliant in

5.

some aspects of their case plan, Murray noted that the home was clean and appropriate and parents did not appear to be under the influence of drugs.

On June 1, 2012, Murray made an unannounced visit to the home. It was remarkably clean and tidy and the children appeared to be happy, clean, healthy, and appropriately dressed with no signs of abuse or neglect. Mother said she would deliver the paperwork on June 4, but she again failed to do so.

At a status review hearing on June 8, 2012, the attorney for the children asked the court to remove the children from the home because of parents' noncompliance with their case plan. Both mother and father had been terminated from their child abuse classes, and they had failed to submit to random drug tests. The children's attorney expressed her concern that parents were not being honest or forthcoming. For example, mother told the Agency she had taken Jacob to an eye clinic, which was her excuse for missing an appointment with the social worker, but the clinic reported that Jacob had not been seen since 2010. The children's attorney believed the children were at ongoing risk because there was "a complete, not only, failure to cooperate with their services [by parents], but then a misrepresentation and avoidance with contact with the agency." The Agency's attorney found it very disturbing that parents had lied to a social worker but did not recommend removing the children.

After considering the evidence and hearing the arguments, the juvenile court ordered the Agency to detain the children and file a section 387 petition based on parents' noncompliance. The same day, Agency filed a supplemental juvenile dependency petition alleging noncompliance and lying to the Agency.

Initially, Alissa and Katelyn were placed with the maternal grandmother, and Mario and Jacob were placed in a foster home. Alissa told a social worker she was happy to go with her grandma, and "as long as I get to see my brothers I'm okay." Mario and Jacob did not cry when their parents dropped them off and did not cry when it was time to go with the foster parents. On June 12, 2012, the grandmother said that she would not

be able to keep Katelyn long-term, and she was placed in the foster home with her brothers. Alissa was adamant about remaining in her grandmother's care, and for this reason, the Agency determined it would not be in her best interest to place her with her half-siblings.

Mother continued to give the Agency dishonest excuses for her noncompliance. On June 15, 2012, mother told Murray that she had provided all her paperwork to her attorney. Mother's attorney, however, was not aware of receiving any paperwork and said she had instructed mother to provide whatever documentation she had directly to the Agency. Mother and father tested positive for methamphetamine on June 29, 2012.

In the Agency's jurisdiction/disposition report filed on July 9, 2012, the Agency recommended that the children remain dependents of the court and no further family reunification services be offered to parents. The current care providers for Mario, Jacob, and Katelyn were willing to adopt and interested in adopting them. The maternal grandmother was also willing to adopt and interested in adopting Alissa. Alissa reported that she was happy to be back living with her grandmother. She realized she could not live with her parents at that time and stated she would like to live with her grandmother until she grows up. Murray also noted that "Alissa is under the impression that she will be returning to her parents' care," and Murray was concerned that "discussing adoption with her could cause her to become very anxious and distressed .…" Murray planned to discuss adoption and legal guardianship with Alissa after the court terminated family reunification services with parents.

On July 31, 2012, the juvenile court found the allegations of the supplemental petition true. At a hearing on disposition on September 4, 2012, mother requested return of the children. The juvenile court denied mother's request, ordered no additional family reunification services, and set a section 366.26 hearing. Mother and father were granted visitation with children two times per month.

The Agency prepared a section 366.26 report, filed on December 7, 2012. It recommended termination of parental rights and a permanent plan of adoption by the maternal grandmother for Alissa and adoption by the current foster family for Mario, Jacob, and Katelyn. Alissa and the grandmother lived in Santa Cruz County, and the younger three children and their foster family lived in Tulare County. The grandmother and the foster family had developed a very good relationship, and Alissa and the three younger children were "able to maintain a strong sibling bond because the respective caretakers have made an effort to facilitate a bond between the children." The caretakers made an effort for the children to see each other twice a month and the children talked regularly by phone and Skype.

Murray was present at the start of a visit between parents and Mario, Jacob, and Katelyn on September 7, 2012. While waiting for parents to arrive, Murray observed that the children had become very attached to their foster parents and clung to them while waiting. (The visit itself was not described.)

Parents had a visit with Mario, Jacob, and Katelyn on September 20, 2012, and the foster parents reported that the visit went well.

Murray observed part of a visit between Alissa and parents on September 22, 2012. Alissa was excited to see them and gave mother a hug. Mother brought pictures and activities for them to do together.

Another visit was scheduled for the younger children for October 22, 2012. At this visit, the interactions between parents and children went well. Mother appeared to have a stronger bond with Mario as she engaged with him the most. Jacob kept to himself and played alone in the corner. Father engaged Katelyn the most. The visit ended with hugs and kisses.

On November 30, 2012, parents and a set of great-grandparents attended a visit with the three younger children. Mother played with Jacob, and Katelyn played with father. Mario sat on his great-grandfather's lap. Mother asked Jacob and Mario about

8.

school.  Father tickled Mario and Katelyn, while Jacob played with mother.  Jacob kissed his mother.  Mario said he was going to draw a family picture and mother said she would help and then Katelyn joined them.  The children helped mother clean up, and everyone hugged and kissed at the end of the visit.

Alissa visited with her mother at least once a month.  The grandmother reported that the visits went well.  Alissa enjoyed spending time with her mother, and mother was appropriate during the visits.

According to the foster parents, after visits with parents, the children had more nightmares, tantrums, and day-to-day difficulties.  Mario had a very difficult time after the visit on November 30 because it was only a few days after his birthday.  He cried on the drive home because parents did not sing him happy birthday.  The foster mother reported that Mario interpreted this as his parents not caring about him.

The Agency concluded:  "While it is clear that the parents love their children and the children enjoy visiting with their parents, that relationship does not supersede the importance of the children having a safe and stable permanent home through adoption.  It is in the children's best interest that all court ordered visitation be ended at this time with both the mother and the father so that the children can move forward in building permanency in a safe and stable home."

Alissa stated that she understood she was going to be adopted and she was happy her grandmother would be adopting her.  The Agency reported that Mario, Jacob, and Katelyn were too young to understand the implications of adoption, but they were very happy and comfortable in their current home and developed a bond with their prospective adoptive parents.

The section 366.26 hearing was scheduled for December 18, 2012.  On that day, mother called her attorney's office and said she was running late.  Father's attorney received a call from father saying he did not have a ride to the court.  In an abundance of caution, the court postponed the hearing.  The rescheduled hearing was held on

January 15, 2013.  Mother and father did not appear.  Mother's attorney told the court that mother and father were "several hours away, but they were on their way."  The court stated there was no good reason to excuse parents' absence and proceeded with the hearing.

Mother's attorney argued that it was clear there was affection between the children and mother, and mother had a bond with the children.  She asked the court to consider the reports of mother's visits with the children and not terminate her parental rights.  Father's attorney made a similar argument.

The children's attorney agreed that the visits "undoubtedly go well," but they occurred only twice a month and did not rise to the level of a beneficial child-parent relationship.

It appeared to the court that visits did go well and parents made an effort to visit with the children.  The court concluded, however, that "the level of contact and the history of this case [was] not such that it would be beneficial to these children to maintain the parental relationship .…"  The court agreed with the Agency's recommendation and terminated parental rights for mother and father.

Mother filed a notice of appeal on January 22, 2013.

### *DISCUSSION*

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child.  (*In re S.B.* (2009) 46 Cal.4th 529, 532.)  The Legislature's preferred permanent plan is adoption.  (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.)  "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if [1] it determines by clear and convincing evidence the child is adoptable within a reasonable time, and [2] the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi).  (§ 366.26, subd. (c)(1).)"  (*Id.* at p. 290.)

10.

In this case, mother does not dispute that the children are adoptable; she contends only that the statutory exception of a beneficial parent-child relationship applies. (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to prove an exception applies. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

In order to apply the beneficial parent-child-relationship exception to avoid termination of parental rights, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This means the court must find that the parent-child "relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) In making this determination, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

The beneficial parent-child-relationship exception requires the parent to show more than frequent and loving contact or pleasant visits. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception[,] the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.*, *supra,* at p. 555.)

11.

We review the juvenile court's order under the abuse-of-discretion standard. This means that we review the court's findings of fact for substantial evidence and its conclusions of law de novo, and we reverse its application of law to facts only if it is arbitrary and capricious. (*In re C.B.*, *supra*, 190 Cal.App.4th at p. 123.)

Mother contends the juvenile court erred by finding that the beneficial parent-child-relationship exception did not apply. Where, as in this case, the appellant had the burden of proof at trial, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) The issue is whether the appellant's evidence was uncontradicted, unimpeached, and of such weight as to leave no room for a judicial determination that it was insufficient to support a finding. (*Ibid.*) Mother suggests that we employ a standard more favorable to her as the appellant, but she offers no authority for her position.

Here, there was no dispute that mother regularly visited her children. The juvenile court, however, did not find the children would benefit from continuing the relationship, implicitly finding that the children would not be greatly harmed by the severing of the parent-child relationship. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) To prevail on appeal, mother must show the record compels a different result.

Mother points out that the children were happy to spend time with her and were excited to see her, but loving contact and pleasant visits are not enough to establish the beneficial parent-child-relationship exception. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.) Mother asserts that she interacted with her children in a parental fashion during visits. While this may be true, this is not sufficient to show the exception applies. Mother must also show that the children would suffer detriment if the relationship were terminated. (*Ibid.*)

Mother argues there was no evidence that the younger children have a stronger bond with their prospective adoptive parents than they have with her, but she cites no

authority for the proposition that such a showing is required.  Again, we observe it was *mother's* burden to establish that the beneficial parent-child-relationship exception applied.  It was not the Agency's burden to compare the prospective adoptive parents to the biological parents.

Mother also claims that her devotion to her children was evidenced by her compliance with her case plan.  Mother cites *In re S.B.* (2008) 164 Cal.App.4th 289, 301 (*S.B.*), in which the appellate court concluded that the only reasonable inference from the record was that the child in that case would be greatly harmed if her relationship with her father were terminated.  In *S.B.*, the court observed that the father's devotion to his daughter "was constant as evinced by his full compliance with his case plan and continued efforts to regain his physical and psychological health." (*Id.* at p. 300.)  *S.B.* does not stand for the proposition that a parent's full compliance with her case plan is sufficient to establish the beneficial parent-child-relationship exception.  In *S.B.*, unlike the present case, there was a bonding study and an expert testified about the potential for harm to the child if she were to lose the parent-child relationship. (*Id*. at p. 295.)  Furthermore, mother acknowledges that she failed to show up for drug tests, tested positive for drugs, and failed to provide proof of attendance in aftercare.  Mother fails to mention that she was also terminated from a child abuse course for poor attendance, she did not return her social worker's phone calls, and she lied to her social worker about taking her child to an eye clinic.  To the extent a parent's full compliance is relevant in determining whether the beneficial parent-child-relationship exception applies, the record in this case shows that mother was *not* in full compliance with her case plan.

Finally, mother attempts to show that the children would suffer detriment if her parental rights were terminated.  Mother cites the jurisdiction/disposition report in which Murray mentioned, in July 2012, that she was concerned that discussing adoption would cause Alissa to become anxious and distressed.  Mother ignores the fact that, by December 2012, Alissa said that she understood that she was going to be adopted and

was happy that her grandmother would adopt her. At that time, Murray did not report any anxiety or distress on Alissa's part.

There was no testimony from a therapist or other expert that the children would suffer harm if mother's parental rights were terminated, and no representative for the children or other third party recommended preserving mother's parental rights. (Cf. *In re Amber M*. (2002) 103 Cal.App.4th 681, 689-690 [beneficial parent-child-relationship exception applied where (1) psychologist concluded eldest child's primary attachment was with mother and it would be detrimental to sever relationship, and (2) CASA disagreed with recommendation of adoption because of bond between mother and her children]; *S.B.*, *supra*, 164 Cal.App.4th at p. 295 [beneficial parent-child-relationship exception applied where bonding study was conducted and expert testified of potential harm to child if she were to lose parent-child relationship].) Mother essentially asks this court to infer harm based on the affection the children demonstrated for their mother. The juvenile court, however, did not make this inference, and it is not our role to substitute our judgment for that of the juvenile court. (*In re Casey D*. (1999) 70 Cal.App.4th 38, 53.) On this record, we cannot say the juvenile court was compelled to find that the children would suffer harm if their relationship with mother ended.

Accordingly, we reject mother's contention that the juvenile court erred by failing to apply the beneficial parent-child-relationship exception in this case.

## *DISPOSITION*

The juvenile court's order is affirmed.